(No. 15894.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK McGUIRK, Plaintiff in Error.

*Opinion filed April 14, 1924—Rehearing denied June 5, 1924.*

1. CRIMINAL LAW—*evidence of another offense is competent if it tends to prove defendant guilty of crime charged.* Evidence of an offense wholly unconnected with the crime charged is inadmissible, but the test of admissibility is the connection of the facts proved with the offense charged, and any testimony tending directly to show the defendant guilty of the crime charged is competent.

2. SAME—*evidence of another offense is admissible to identify the accused.* Evidence which tends to aid in identifying the accused as the person who committed the particular crime under investigation is admissible although it tends to show him guilty of other crimes.

3. SAME—*what facts connected with arrest of accomplice are admissible to identify accused.* Circumstances connected with the arrest of a confessed accomplice, who testifies for the State, are admissible as tending to identify the accused, where police officers who arrested the witness testify that another party, who the witness says was the accused, was with him but escaped; and it is proper to prove what was said by the accused at the police station after his arrest, and to prove circumstances connecting the accused with the finding of a revolver which the accomplice testifies was used in committing the crime.

4. SAME—*when refusal to compel witness to give name of another witness of the crime is not prejudicial.* In a prosecution for

312—17

robbery, where the defendant is furnished with a list of the State's witnesses, it is not error for the court to sustain an objection, on cross-examination of the prosecuting witness, to a question as to who was with him when he was held up, and the defendant can not complain as being prejudiced in any way because the State did not desire to call said party or to give her name as a witness.

5. SAME—*the jury must pass upon evidence of alibi.* It is the province of the jury to pass upon the defendant's evidence as to an alibi, and where there is competent evidence which, if undisputed, would be sufficient to identify the accused, the Supreme Court will not set aside the verdict on the ground of insufficiency of the evidence to convict.

6. SAME—*testimony of accomplice is not incompetent because induced by promise.* The testimony of an accomplice, if otherwise admissible, is not rendered incompetent because it was made under a promise of some sort; but such fact may be considered by the jury as affecting the credibility of the witness.

7. SAME—*when an instruction as to testimony of accomplice is proper.* An instruction that the defendant may be convicted upon the uncorroborated testimony of an accomplice, and that if the jury believe such testimony is true "then they can act upon the same as true," is not erroneous as omitting the requirement of proof beyond a reasonable doubt, as such instruction does not direct a verdict and is proper where the question of reasonable doubt is presented in other instructions.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOHN A. SWANSON, Judge, presiding.

FRANK A. McDONNELL, and S. B. McDONNELL, JR., for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and VIRGIL L. BLANDING, (EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error was indicted, tried and convicted in the criminal court of Cook county of the crime of robbery. The case is here on writ of error.

Thomas J. White testified that on the evening of March 26, 1921, while he was sitting in an automobile with a girl friend, just south of the German building, in Jackson Park, two men approached him, one on either side of his car. One man came up to the driver's seat, showed the witness a revolver and said, "Start the car." This man the witness identified as Robert Olson, who at the time of the hearing was serving an indeterminate sentence in the penitentiary. The other man climbed into the back seat and was the man identified by the witness as the plaintiff in error. The witness stated that upon the command to start the car he "stalled around" for awhile and then said he could not start the car but would if he could, and one of the men (the witness did not know which one) said, "See how much dough he has got." The witness said, "I have $15, but you are not going to take it all, are you?" and one of them said, "No; give us ten." The witness passed $10 to the two men, who were then in the rear of the car, Olson having climbed into the rear seat in the meantime. The men then got out of the car, walked back about one hundred feet and then came past witness' car again and up to a car ahead of him, one of them going on one side and one on the other. The man who was in that car got out and ran, and the two men transferred the girl, who was in the front seat, to the rear and ran it (apparently meaning running the engine) for some time, and then got out and walked across the park behind the Field Museum. The witness testified that both men had guns, and when he turned to look at them they brought their guns up to the position of ready. There was an arc light close to witness' car so that he could see. He testified that Olson had on dark clothes, a dark cap, and an overcoat about three-quarters in length, and that both men had the collars of their coats turned up, but the witness did not think the collars extended above the chin; that he could see the lower part of the forehead, nose, mouth and eyes; that the man who put the gun to his side

weighed about 175 or 180 pounds. The witness could not testify to the kind of clothes the man in the rear seat had on, except that his overcoat was about three-quarters length, of the ulster type, coming to slightly below the knees, and that he wore a dark cap. The witness testified that later,— he thought about ten days afterward,—he saw plaintiff in error at the Sheffield avenue (or Town Hall) police station, on the north side in Chicago, and that plaintiff in error asked him if he was going to identify him, and witness replied that he was not going to tell him whether he was going to identify him or not, and told him he did not think he was entitled to any consideration, so far as witness was concerned; that plaintiff in error was trying to get information from the witness to get himself liberated, and said the witness was lucky that he "didn't get trimmed;" that he had a chance to play ball some place, and if he got out of this (evidently referring to the trouble following his arrest) he would get out of town and play ball. The witness testified that plaintiff in error came to the witness' office in the City Hall and asked him if he was going to identify him and if he could not let him off, and the witness replied that he did not see why he should; that he and the girl had suffered the scare of a hold-up and he was going through with it. At the Sheffield avenue station, when questioned by the judge, the witness, in referring to plaintiff in error, said, "Evidently he is the man," plaintiff in error having previously talked with the witness on the subject of his identification.

Robert Olson, who was brought from the penitentiary for the purpose of testifying, testified that on the evening in question he and plaintiff in error were walking in Jackson Park, near the southeast corner of the German building, where there was a machine standing; that plaintiff in error went to the right-hand side and witness went to the left-hand side, and that the intention was to take the machine; that they pointed revolvers at the man (White) and told

him to drive ahead, but the machine would not start; that plaintiff in error asked the man how much money he had, and he replied $15, and witness said, "Give me the fifteen," which the man did, and witness gave him back $5; that he and plaintiff in error then walked about one hundred and twenty-five feet back of the machine and then went to a machine in front of White's machine; that when the man in the machine ahead of White's got out the witness and plaintiff in error ran; that neither of them had anything on to conceal their faces, but that they both had on overcoats with the collars turned up and both wore caps. Later in the examination the witness testified that he and plaintiff in error got their revolvers at Whiting, Indiana, about two weeks previous, and he identified the 38-caliber gun which was shown him at the hearing as the one he purchased and which was taken from him at the time of his arrest and that the 32-caliber revolver was plaintiff in error's. The revolvers were nickel-plated, but the witness did not know the make and stated that they were not used though they were loaded. The witness testified that he identified both plaintiff in error and White at the Sheffield avenue station, and testified to the circumstances of such identification and that he signed a statement or confession at that time. At the time of the trial the witness also identified White as the man in the automobile from whom he and plaintiff in error took $10. After the witness' arrest by the Town Hall officers, plaintiff in error was taken from his home a few hours later the same night and placed in custody at the Sheffield avenue station. The witness testified that at the time of his trial he pleaded guilty under the impression that he would get a sentence of from three to twenty years; that he was not warned by the judge as to the result of his testimony; that he was made no promises, except that the assistant State's attorney told him he would see the trial judge and would see to it that "they"

recommended a shorter sentence, or a recommendation to the pardon board, or something of that sort, but that he afterward understood he was actually given a sentence of from ten years to life, and testified if he had known that was to be the result he would have taken a jury trial.

The police officers testified substantially to the same circumstances surrounding Olson's arrest on the north side in Chicago on March 31, 1921; that they were going along the street and were approaching two men coming from another direction but who crossed the street, and as the officers crossed the street the two men turned and ran, and at that time Olson was caught and arrested. After talking with him and being told by him that plaintiff in error was the man with him, and on being told where he lived, they went to plaintiff in error's home, on the south side. They found him in bed and took him to the north side station, where Olson was in custody. On being brought into Olson's presence the latter said, "He's the fellow that was with me last night," and the plaintiff in error did not say anything. They then asked plaintiff in error what he did with the gun, and after some questioning plaintiff in error said he threw it away, and mentioned the location, but on their failure to find the revolver they again questioned him, and the second time they took him with them to another location which he gave, where they found the 32-caliber revolver, which plaintiff in error said was his. The statement heretofore mentioned which Olson signed, the officers testified as to each paragraph Olson and plaintiff in error answered that the facts were stated correctly, but that plaintiff in error did not sign the statement.

White was present at the police station April 1 or 2, and Olson said, referring to White: "I remember you; we held you up in Jackson Park, only you wore a cap that night." The officers, or one of them, then asked plaintiff in error what he had to say, and he answered, "If Olson says it is so, why it must be so." The officers also testified to the

taking of the revolver from Olson and the finding of the other revolver after questioning plaintiff in error, and that the revolvers in evidence were the ones that Olson and plaintiff in error had, and that plaintiff in error told them that he threw his gun where it was found. One of the officers testified the revolvers were kept at the station until the preliminary hearing and then were taken to the custodian's office. The officers were unable to describe how Olson was dressed when he was arrested or how the man who ran away was dressed.

The plaintiff in error, his father, mother and Edgar Conley testified that plaintiff in error was at home on the evening of March 26, the evening of the alleged hold-up in Jackson Park; that about seven or eight o'clock that night plaintiff in error and Conley went to the Holy Cross church; that they returned about nine o'clock and did not leave the house again, one of the witnesses testifying that plaintiff in error and Conley played rummy until 10:30 or 11:00 o'clock that night. Plaintiff in error denied that he was ever with Olson at Whiting, Indiana, or that he ever purchased a revolver, or that he had ever seen the revolver testified to as being his. He denied that he was in the vicinity where it was testified Olson was arrested or the revolver was found, and denied that he had talked with White at the Sheffield avenue station. He admitted that he had talked with White at his office, but at the time told him he thought White had the wrong party and told him not to make any mistake, but that White said he was going to go the limit. Plaintiff in error denied that he ever stated that the statements recited in Olson's confession were true, but that he did say as to that confession, "That don't go with me." He denied that he had ever been out with Olson on March 26 or 31, but admitted that he had met him once at a dance hall and that they had gone out together to get something to eat. He also testified that the police officers kicked and pushed him after he was arrested and

when he was at the Town Hall police station. He denied that he was taken out to the vacant lot where he pointed out the revolver which it was testified was his.

The foregoing is the substance of the testimony offered as to the offense with which plaintiff in error was charged.

A number of errors are assigned which it is contended prejudiced the accused on his trial. It is contended that error was committed in allowing the evidence to be introduced of what occurred on the evening of March 31 when Olson was arrested, and later the same evening or the next morning when plaintiff in error was arrested, because it had no connection with the issue in the case. It is true that evidence of an offense wholly unconnected with the crime charged is inadmissible, but any testimony that tends directly to show the defendant guilty of the crime charged is competent. The test of admissibility is the connection of the facts proved with the offense charged. (*People* v. *Jennings,* 252 Ill. 534.) Evidence which tends to aid in identifying the accused as the person who committed the particular crime under investigation is admissible even though it might tend to show him guilty of other crimes. (*People* v. *Mandrell,* 306 Ill. 413; *People* v. *Horn,* 309 id. 23.) The facts and circumstances surrounding the arrest of Olson and plaintiff in error which have heretofore been related had a direct tendency to connect plaintiff in error with the crime charged. There had been nothing previous to the night of Olson's arrest on the north side in Chicago to indicate that plaintiff in error was one of the men who held up White, except that he had apparently called at White's office before the preliminary hearing to see whether White intended to identify him as one of the robbers. The testimony had a tendency to show that Olson and plaintiff in error were associates; the identification by Olson and White of plaintiff in error; the admissions of Olson; that plaintiff in error had admitted the ownership of the revolver and its being found where he said it could be found; where and

when the revolvers were purchased; that the revolvers in evidence were the same ones found at the time of the arrest, and that they were the ones used at the time of the hold-up. We think these were all pertinent facts having a very direct connection with the crime charged. It was proper to prove what was said by plaintiff in error at the police station and the circumstances of the finding of the revolver. *People* v. *Dean,* 308 Ill. 74; *People* v. *Cunningham,* 300 id. 376; *People* v. *Maciejewski,* 294 id. 390.

It is contended that it was error for the court to sustain an objection, on the cross-examination of White, as to who was the young lady in the car with him on the night of the alleged hold-up; that it might have been of material benefit for plaintiff in error to know who she was. The trial court stated that he could not see how it was material. Her name had evidently not been given as a witness before the trial and she was not called as a witness during the trial. The attorney for plaintiff in error stated that they gave her name at the Sheffield avenue station but he took no notice of it at that time, assuming that she was going to be a witness. Plaintiff in error had been furnished with a list of the witnesses whom the State expected to call, and the name of the girl was not given. Apparently plaintiff in error had not desired to call her. We do not think plaintiff in error was prejudiced because her name was not given at the time of the trial, and there was no error in the court's ruling in refusing to give it.

It is contended that the testimony of four witnesses that plaintiff in error was at home and at a church in the neighborhood of his home on the night of the robbery established plaintiff in error's innocence. It was the province of the jury to pass upon the evidence as to the alibi, and in view of the testimony offered we do not feel justified in setting aside the verdict on the ground of the insufficiency of the evidence to convict plaintiff in error. *People* v. *Hildebrand,* 307 Ill. 544.

It is further argued by counsel for plaintiff in error that the court committed error in allowing the jury to see the admission of the witness Olson into the judge's chambers, and the judge, after coming from chambers, dictating into the record what Olson had said in chambers as to his motive, or absence of motive, in testifying for the State, and then permitting further open examination of Olson. The abstract does not show that Olson went to the judge's chambers and then came back and testified, and on the record before us there was apparently considerable discussion as to what Olson understood would be the sentence in his own case or what would be the recommendation of the State's attorney and the trial judge, and he testified that he would have plead not guilty if he had known that he was to receive the sentence which was imposed upon him. On the trial Olson testified positively as to the facts heretofore related, and there was nothing brought out to indicate that he wished to change his testimony or that what he testified to was not the truth. He was cross-examined as the State's witness, and we think there was no effort on his part to show that he was not telling the truth as to what had occurred but only that he would have plead differently at his own trial. The testimony of an accomplice, if otherwise admissible, is not rendered incompetent because it was made under a promise of some sort, but such fact may be considered by the jury as affecting the credibility of the witness. (*People* v. *Andrae,* 305 Ill. 530.) The jury were told in an instruction that they should act upon the testimony of an accomplice with great care and caution and subject it to careful examination in the light of all other evidence in the case; and that the jury ought not to convict upon such testimony alone, unless, after a careful examination of such testimony, they are satisfied, beyond a reasonable doubt, of its truth and that they can safely rely upon it. If there were any evidence in the record that Olson had been promised some sort of immunity, plaintiff in error's counsel could

have offered an instruction telling the jury they had a right to take such fact into consideration as affecting the witness' credibility. They offered no such instruction. We do not think plaintiff in error was in any way prejudiced by what occurred at the time of the trial with reference to Olson's testimony.

It is argued that the court committed reversible error in giving on behalf of the State the following instruction:

"The court instructs the jury that under the laws of this State a defendant may be convicted upon the uncorroborated testimony of an accomplice; and if the jury believe from the evidence in this case that the testimony given by the witness Robert Olson is true, then they can act upon the same as true. The testimony of an accomplice, like all other evidence in the case, is for the jury to pass upon."

It is stated that this instruction eliminated the requirement of proof beyond a reasonable doubt. We do not think the instruction can be so construed. It simply told the jury that they could convict upon the uncorroborated testimony of an accomplice, and if they believed his testimony was true they could act upon the same as true, but it did not undertake to tell the jury that if they believed the testimony of an accomplice they must convict the accused. There was another instruction given to the jury that they should act upon the testimony of an accomplice with great care and caution, and that unless they were satisfied, beyond a reasonable doubt, of its truth they could not safely rely upon it. The instruction objected to stated the law correctly and it was not error to give it. Substantially a like instruction, worded the same as the one objected to here, was given and approved by this court in *People* v. *Frankenberg,* 236 Ill. 408. The question of reasonable doubt was presented in other instructions. It is sufficient if the instructions, considered as a series, substantially present the law of the case fairly to the jury. *People* v. *Heard,* 305 Ill. 319.

We think the evidence justified the jury in finding plaintiff in error guilty of the crime charged.

We find no serious error in the record, and the judgment of the criminal court of Cook county will be affirmed.

*Judgment affirmed.*